# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-0142
Filed June 24, 2026

———————————

**State of Iowa,**
Plaintiff–Appellee,
v.
**Charles Eugene Pennington,**
Defendant–Appellant.

———————————

Appeal from the Iowa District Court for Hancock County,
The Honorable Gregg R. Rosenbladt, Judge.

———————————

**CONVICTION AFFIRMED, SENTENCE VACATED IN PART,
AND REMANDED FOR LIMITED RESENTENCING**

———————————

Martha J. Lucey, State Appellate Defender, and Melinda J. Nye, Assistant
Appellate Defender, attorneys for appellant.

Brenna Bird, Attorney General, and David Banta, Assistant Attorney
General, attorneys for appellee.

———————————

Considered without oral argument
by Ahlers, P.J., and Buller and Sandy, JJ.
Opinion by Buller, J.

1

**BULLER, Judge.**

Charles Pennington appeals his convictions for sexual abuse and indecent contact with a child. He challenges a noncorroboration instruction used at trial and fines imposed at sentencing. We affirm the conviction, finding no preserved error warranting reversal on the instructional issue. Accepting the State's concession, we vacate the fines imposed on the sex-abuse counts and remand for a limited resentencing on those fines only.

## BACKGROUND FACTS AND PROCEEDINGS

Pennington was in a relationship with F.F.'s mother for F.F.'s preteen and early teen years. When F.F. was thirteen, her father had physical care and she lived with her mother, her sister, and Pennington in a Garner apartment for one night each week, every other weekend, and four weeks in the summer.

That year, as described by F.F. at trial, Pennington "would start to, like, wrestle and start trying to take [her] shirt off and it slowly progressed from there." F.F. sometimes didn't wear a bra at that age, so when Pennington took her shirt off, her breasts were exposed. Eventually he started taking her pants off too. He groped her breasts and inner thighs, "a couple times a month or so" at the Garner apartment. And F.F. remembered that Pennington would sometimes be "aroused" while they wrestled.

The family moved to Britt before F.F. turned fourteen. F.F. and Pennington had more conflict at the Britt house, and Pennington "would start getting aggressive," grabbing at her breasts and vagina with his hands. Before he touched F.F., Pennington would watch movies or TV shows where actors "would be naked or they would have the scene where they're having sex or love scenes." On multiple occasions—F.F. estimated more than once per month—Pennigton would "stick" his penis "inside" her vagina and

2

penetrate her. F.F. specifically remembered that Pennington would pull out and ejaculate into his hand instead of her body. On at least some occasions, Pennington would pin her wrists so she couldn't physically resist.

When F.F. disclosed the "wrestling" to her mother, F.F.'s mother didn't believe her and even told her that Pennington taking her shirt off to wrestle was "normal" and "fine." F.F. did not think her mother would believe her about the abuse, and she was right: after they moved to Britt and the abuse increased, F.F. tried again to tell her mother, but her mother said she was lying. F.F. eventually stopped staying with her mother and Pennington.

F.F. was sure the sexual abuse all happened before she turned fifteen because she remembered visiting Pennington in prison on her fifteenth birthday; he was incarcerated for physically abusing another child. After she turned eighteen, F.F. reported the abuse to police. Her mother became marginally more supportive over time, encouraging F.F. to report the abuse in a way that didn't make her mother or her parenting "look bad." F.F. and her mother had essentially no relationship by the time of trial.

Garner police and the Division of Criminal Investigation (DCI) both investigated. Officers observed that F.F.'s disclosure of the abuse to them was consistent across multiple interviews. A DCI agent interviewed Pennington for about ninety minutes, and he denied sexually abusing or otherwise acting inappropriately toward F.F. Pennington admitted to police that he had photos of F.F. and her sibling's faces digitally pasted onto swimsuit models but claimed they were a "body image" exercise for F.F. The DCI agent testified that explanation "didn't make a lot of sense." And when the agent pushed back on this and other claims, Pennington ended the interview.

F.F.'s sister testified at trial that she did not witness any sexual abuse but did corroborate the family's living arrangements and that Pennington would wrestle F.F. (sometimes without a shirt but possibly with a bra). The sister's statements to a forensic interviewer were similar, plus she confirmed that Pennington and F.F. were sometimes alone. The sister also testified that their mother had previously coached the sister into making false allegations against their biological father.

F.F.'s mother did not testify at trial, but police described her history of involvement with law enforcement and what was then the Department of Human Services (DHS). In a police interview, the mother corroborated portions of F.F.'s report and described additional inappropriate behavior by Pennington. First, she confirmed that Pennington and F.F. wrestled and that at times she thought it was "inappropriate." Second, she described the photographs on Pennington's phone, explaining that F.F. and another female sibling's faces were "Photoshopped onto the bodies of supermodels or women in swimsuits."

An expert witness from a child protection center organization addressed sexual abuse dynamics. She testified generally as to delayed disclosure, the memory and recall of children, and grooming. She told the jury that, as part of the grooming process, some sex offenders use progressive touch with children, starting with nonsexual touching and advancing to sexual abuse. She said they do this to gauge children's reactions, resistance, and likelihood they will report the abuse. She also testified that it is common for children to delay disclosure or not report abuse when they fear a parent or other adult won't believe them. And she explained that abused children frequently remain in contact with their abusers, sometimes because they have no control over which adults are in their lives.

After hearing this evidence, a Hancock County jury found Pennington guilty as charged, of two counts of sexual abuse of the third degree, class "C" felonies in violation of Iowa Code section 709.4(1)(b) (2017), and one count of indecent contact with a child, an aggravated misdemeanor in violation of section 709.12(1). The district court sentenced Pennington to consecutive terms in prison and imposed a fine for each count. He appeals, raising challenges to a jury instruction and the fine imposed.

## STANDARD OF REVIEW

We review both jury instructions and the legality of a fine for correction of errors at law. *State v. Kraai*, 969 N.W.2d 487, 490 (Iowa 2022) (instructions); *State v. Wilbourn*, 974 N.W.2d 58, 65 (Iowa 2022) (fines).

## DISCUSSION

Instructions informing jurors that witness testimony does not require corroboration to sustain a verdict have wound their way through our courts over the last decade. First, two panels of our court approved noncorroboration instructions in unanimous unpublished panel decisions. *State v. Altmayer*, No. 18-0314, 2019 WL 476488, at *5 (Iowa Ct. App. Feb. 6, 2019); *State v. Barnhardt*, No. 17-0496, 2018 WL 2230938, at *4 (Iowa Ct. App. May 16, 2018). Then, our court later—en banc and with some new members—disavowed that view explicitly in *State v. Kraai*, No. 19-1878, 2021 WL 1400366, at *6–7 (Iowa Ct. App. Apr. 14, 2021), *aff'd,* 969 N.W.2d 487.

On further review, the supreme court in *Kraai* found improper a one-sentence instruction that read: "There is no requirement that the testimony of a complainant of sexual offenses be corroborated." 969 N.W.2d at 490, 491–92. The court focused on two problems. First, the court criticized "the

absence of a symmetrical instruction regarding the noncorroboration of [the defendant]'s testimony." *Id.* at 493. And second, the court was critical that there was no "universal instruction regarding the noncorroboration of all other witness testimony." *Id.* These defects, the court reasoned, created too great a risk that the instruction unduly emphasized the victim's testimony. *Id.* at 495. The court found the instruction erroneous but any error harmless. *Id.* at 499.

Next, in *State v. Mathis*, the supreme court considered a functionally equivalent instruction—substituting "an alleged victim" for the archaic term "complainant." 971 N.W.2d 514, 519 (Iowa 2022). The court's analysis tracked *Kraai*, and the court reversed the conviction, finding under the facts and circumstances of the case that the error was prejudicial. *See id.* at 521.

Most recently, in *State v. Ross*, the supreme court split 4–3 over the following instruction:

> You should evaluate the testimony of [the alleged victim] the same way you evaluate the testimony of any other witness. The law does not require that the testimony of [the alleged victims] be corroborated in order to prove that [they were] sexually abused. You may find the Defendant guilty of Sexual Abuse if [the alleged victim]'s testimony convinces you of guilt beyond a reasonable doubt.

986 N.W.2d 581, 584 (Iowa 2023); *see id.* at 591–92 (Mansfield, J., dissenting). The majority again reversed, finding this instruction still implied corroboration was needed for witnesses other than the victim. *Id.* at 585–89. And the court stressed that a proper noncorroboration instruction would inform jurors that no witness's testimony need be corroborated. *Id.* at 589.

That brings us to this case. The district court gave the following noncorroboration instruction:

> There is no requirement that the testimony of a complaining witness be corroborated. Likewise, there is no requirement that any other witness, including the defendant's testimony be corroborated.

The only objection Pennington advanced below was that the instruction should "read that there's no requirement that the testimony of any witness be corroborated." On appeal, Pennington contends the instruction as given was error under the *Kraai* line of cases; incorrectly referenced his "testimony" when the jury heard his prior statements but he didn't testify; was confusing when cross-referenced with other instructions; and violated his constitutional rights. But at most only the first of those claims was preserved, and we limit our review accordingly.

So, did the instruction given here cure the defects that concerned the supreme court in *Kraai*, *Mathis*, and *Ross*? We think yes. Although the drafting was imperfect,[1] we conclude on review that the instruction as given avoids the asymmetry of only singling out the victim's testimony and includes a universal statement that the noncorroboration principle applies to all witnesses. *Cf. Kraai*, 969 N.W.2d at 493 (discussing these concerns); *Ross*, 986 N.W.2d at 589 ("The instructions given here missed that mark; they were still particularized to the victims' testimony, and there was still no other instruction telling jurors the noncorroboration principle applies to all witnesses."). Because the challenged instruction cured the defects present in

---

[1] We recognize the time pressures and realities of the trial courtroom, and we do not mean to be overly critical of the trial court's phrasing and punctuation. So we repeat a sentiment expressed by our supreme court more than a century ago:

> It is probably true that no instruction or charge to a jury has ever been drawn with such perfect clearness and precision that an ingenious lawyer in the seclusion and quiet of his office with a dictionary at his elbow cannot extract therefrom some legal heresy of more or less startling character.

*Law v. Bryant Asphaltic Paving Co.*, 157 N.W. 175, 177–78 (Iowa 1916).

*Kraai* and its progeny—and that is the only challenge we can find even arguably preserved by the barebones objection below—we discern no error in the district court using its language rather than Pennington's proposal. *See State v. Morrison*, 368 N.W.2d 173, 175 (Iowa 1985) ("A trial court is not required to word jury instructions in any particular way. If an instruction correctly states the applicable law it will be deemed proper even though an alternative wording is possible." (citation omitted)). The instruction given here was not erroneous under existing case law and does not warrant reversal.

That said, "not erroneous" and "does not warrant reversal" are different from approval. Given supreme court case law, we cannot endorse this instruction as a best practice going forward. The supreme court has made clear its preference for a noncorroboration instruction that singles out no witnesses, specifically suggesting: "No witness's testimony needs to be corroborated to be believed." *Ross*, 986 N.W.2d at 589. The instruction here singles out two witnesses—the victim and the defendant. While we recognize the model jury instructions also single out the defendant's testimony for special treatment (presumably due to Fifth Amendment and accomplice-or-confession-corroboration concerns), the supreme court's decisions are controlling and it seems to us a best practice would be to use the language they have approved rather than deviate from it. So, while the instruction here was not prejudicial error, we emphasize readers of this opinion should not think we are blessing the district court's instruction for use in future trials.

We turn last to the fine issue. The district court imposed a $1,370 fine for each sex-abuse count, apparently under the impression that figure was the applicable minimum. On appeal, the State concedes error because the operative minimum fine in effect on the offense dates was $1,000. *See* Iowa Code § 902.9(1)(d) (2018). We accept the State's concession, vacate only the

fine portion of the sex-abuse-counts sentences, and remand for a limited resentencing for the district court to address only those fines. *See State v. Smith*, 17 N.W.3d 355, 359, 361 (Iowa 2025) (imposing this remedy for a similar issue).

**CONVICTION AFFIRMED, SENTENCE VACATED IN PART, AND REMANDED FOR LIMITED RESENTENCING.**